IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Rodney Dean Hampton, | ) | C/A No. 5:11-698-TMC-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and 5 U.S.C. § 706 to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). The issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings.

I. Relevant Background

A. Procedural History

Plaintiff filed applications for DIB and SSI on August 21, 2006, under protective filing date of August 9, 2006. Tr. 15, 110-19. The State agency and the Social Security Administration ("the Administration") denied Plaintiff's applications initially and upon reconsideration. Tr. 78,

80, 82-83, 85-86, 88-97, 101-04.  Pursuant to Plaintiff's request, an Administrative Law Judge ("ALJ") held a hearing on March 3, 2009, at which Plaintiff, his legal counsel, and a vocational expert ("VE") appeared  Tr. 42-77.  The ALJ issued an unfavorable decision on April 1, 2009. Tr. 12-25.  The Appeals Council denied Plaintiff's request for review of the hearing decision on January 27, 2011, Tr. 1-3, making the ALJ's decision the Commissioner's final administrative decision for purposes of judicial review.  Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on February 23, 2011.  ECF No. 1.

B.  Plaintiff's Background and Medical History

1.  Background

Plaintiff filed applications for DIB and SSI in August 2006, alleging disability since May 1, 2006, because of bilateral shoulder arthritis, cervical spine degenerative disc disease, and an anxiety disorder.  Tr. 15, 110-19, 147.  Plaintiff was 46 years of age as of the date he was last insured for DIB, and 49 years of age as of the date of the Commissioner's final decision.  Tr. 117.  He has a 12th grade education, Tr. 152, and past work experience as an assembly line worker, inspector, a maintenance worker, a dye machine operator, and a laborer.  Tr. 148, 167.

2.  Medical History

Plaintiff went to the emergency room ("ER") of Upstate Carolina Medical Center, Gaffney, South Carolina, on July 17, 2006, for complaints of mild left neck and shoulder pain. Tr. 231-40, 242. He told the provider that he had been experiencing pain in his left shoulder for a week, and that the pain was worse with movement. Tr. 236. He indicated he was not able to work that day. *Id.*  Examination revealed Plaintiff had mild left neck tenderness and a possible disc problem. Tr. 233.  Plaintiff was alert, oriented, and demonstrated present upper extremity motion. Tr. 236. Cervical spine x-rays revealed degenerative changes at C3-4 with neural

foraminal narrowing. Tr. 239, 242. An arm sling was applied, Tr. 237, and he received a prescription for Lortab, Tr. 233.

Plaintiff saw his treating physician, Scott A. Klosterman, D.O., several days later. At that July 21, 2006 visit, Plaintiff's chief complaint was of left shoulder and neck pain. Tr. 246. He told Dr. Klosterman of his ER visit, and noted he was not aware of a prior injury to his shoulder, but noted he did some lifting at work. *Id.* Dr. Klosterman observed Plaintiff was in quite a bit of acute pain, and noted he had tenderness. *Id.* Plaintiff described some paresthesias down to his deltoid area and into the C6 and C7 areas on the arm. Dr. Klosterman determined that Plaintiff had some mid AC joint arthritis as well as shoulder arthritis. *Id.* On examination, he found Plaintiff had a decreased range of motion and weakness in his left shoulder. Empty can testing produced pain. Dr. Klosterman noted that diagnostic films demonstrated degenerative disc problems at C3-4 with some neuroforamen changes. He prescribed Prednisone and Lortab for Plaintiff and said that an MRI might be necessary upon follow up. Tr. 276.[1]

Also on July 21, 2006, Jeffrey Jaindl, D.O. x-rayed Plaintiff's left shoulder and indicated the results showed no acute bony change. Tr. 244.

On August 3, 2006 and again on August 17, 2006, Dr. Klosterman wrote refill prescriptions of Lortab. Tr. 247.

Plaintiff returned to Dr. Klosterman on August 18, 2006, with continued complaints of shoulder and neck pain down the left side of his body. Tr. 275. Plaintiff told Dr. Klosterman the pain had not gotten better. *Id.* Dr. Klosterman noted Plaintiff's history of alcohol abuse and his report that "he has cleaned his life up on that[.]" *Id.* Plaintiff indicated he had not been able to work since his neck pain and that he had difficulty showering and raising hands over his head.

---

[1] The undersigned notes that the record contains duplicative copies of some of Dr. Klosterman's treatment records. *See, e.g.*, Tr. 246, 276 (two copies of July 21, 2006 treatment records).

*Id.* On examination, Dr. Klosterman noted Plaintiff "actually move[d] his hands okay to a certain point and when distracted he [] move[d] his neck with some freedom in pointing out where his pain is." *Id.* Dr. Klosterman indicated Plaintiff pointed to pain in the C7 area. *Id.* Dr. Klosterman assessed shoulder pain, neck pain, and history of alcohol abuse. *Id.* Dr. Klosterman noted that he felt Plaintiff "has legitimate pain," but that he was concerned because the pharmacy informed him Plaintiff had filled the prescription for Lortab, but not the one for Prednisone. *Id.* When Dr. Klosterman confronted Plaintiff about this, Plaintiff indicated the medicine was too expensive. *Id.* When Dr. Klosterman indicated the medicine cost $9.00, Plaintiff did not "have anything to say." *Id.* Dr. Klosterman "reluctantly" gave Plaintiff a one-month supply of Lortab, another Prednisone prescription, and noted Plaintiff would need to be screened to ensure he was not abusing other drugs. *Id.*

Plaintiff saw Dr. Klosterman again on September 15, 2006. Tr. 274. Dr. Klosterman found Plaintiff had decreased range of motion in his neck, especially when lifting his arms bilaterally above his head. *Id.* Dr. Klosterman surmised that Plaintiff had arthritis and impingement syndrome in his left shoulder. *Id.* He refilled the prescription for Lortab, indicated he would consider direct shoulder injections in the future should the pain persist, and again noted the plan to perform screening for abuse of other drugs. Tr. 274.

On September 12, 2006, Dr. Klosterman completed a short questionnaire sent to him by the State agency. Tr. 253. He indicated Plaintiff exhibited "limitation in function due to a mental condition[,]" and rated Plaintiff's thought process as "intact," his thought content as "appropriate," his mood/affect as "worried/anxious," his attention/concentration and memory as "adequate." *Id.* Dr. Klosterman did not respond to the question of whether Plaintiff was able to "relate and communicate adequately." *Id.*

On October 3, 2006, Xanthia Harkness, a State agency psychologist, reviewed Plaintiff's records and completed a Psychiatric Review Technique Form ("PRTF"). Tr. 258-71. Dr. Harkness concluded Plaintiff had anxiety-related and substance-addiction disorders that were nonsevere impairments. Tr. 258. She indicated Plaintiff had the medically determinable impairment of anxiety, Tr. 263, and found Plaintiff had mild restrictions in his activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace, Tr. 268. Dr. Harkness noted Plaintiff's ADLs were "mainly" without physical limits. Tr. 270.

On November 10, 2006, Plaintiff returned to Dr. Klosterman with neck and shoulder symptoms. Tr. 274. Dr. Klosterman observed Plaintiff had a neck spasm, a decreased range of motion in his shoulders, and tenderness in his AC joint. *Id.* Dr. Klosterman injected Plaintiff's shoulder with Marcaine, Lidocaine, and Depo-Medrol, and refilled the prescription for Lortab. Tr. 274.

On January 5, 2007, Plaintiff saw Dr. Klosterman for a follow up regarding his neck and shoulder pain and numbness. Plaintiff told Dr. Klosterman that his pain had decreased immediately following the injection for two weeks, but returned after that time. At this appointment, Dr. Klosterman articulated that he found mild atrophy in Plaintiff's rotator cuff area, and that there was a decreased range of motion and strength on internal and external rotation. Dr. Klosterman felt that Plaintiff had a component of both neck and shoulder pathology, believing the shoulder pathology to be more prevalent at that time. Therefore, he ordered another MRI and refilled the prescription for Lortab. Tr. 307.

On February 5, 2007, an x-ray performed of Plaintiff's neck showed multilevel degenerative change and a left C5-6 disc protrusion. Tr. 309.

On February 7, 2007, State agency physician Dale Van Slooten, M.D. reviewed the record and concluded that Plaintiff retained the physical residual functional capacity ("RFC") to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; push/pull within his lifting capacity; and lift overhead frequently; and that he had no postural, visual, communicative, environmental, or other manipulative limitations. Tr. 280-87. Dr. Van Slooten noted Plaintiff's history of chronic neck and shoulder pain and that x-rays showed degenerative changes at C3-4. Tr. 281. Further, he noted Plaintiff's examinations had indicated decreased range of motion in his shoulder and neck and that he was intact neurologically. *Id.*

On February 13, 2007, Debra C. Price, Ph.D., a State agency psychologist, concluded that Plaintiff had anxiety and substance addiction disorders that were not severe. Tr. 288-301. She found Plaintiff had mild restrictions of ADLs, as well as mild difficulties in maintaining social functioning and concentration, persistence, and pace. Tr. 298. Dr. Price found Plaintiff's mental condition had been stable since his prior review. Tr. 300. She noted Plaintiff could perform light chores, follow instructions very well, and pay attention for hours. *Id.* Dr. Price found Plaintiff's allegations were credible and that his symptoms "impose[d] only minimal limitations on his ability to carry out basic work activities." *Id.*

Plaintiff returned to Dr. Klosterman on February 16, 2007, and Dr. Klosterman shared MRI results with him. Tr. 307. Dr. Klosterman explained the MRI indicated left posterior osteoarthritic changes and disc protrusion; he recommended having Plaintiff evaluated by a surgeon. *Id.*

On May 25, 2007, Dr. Klosterman saw Plaintiff for shoulder and neck pain. At this appointment, Dr. Klosterman noted that Plaintiff was still taking Lortab and that he had not been

able to work for over a year. Tr. 305. He also noted that Plaintiff was not able to lift a five-pound jug of milk without feeling severe pain in his right hand, which required him to lift the jug with both hands. *Id.* Dr. Klosterman advised Plaintiff to go to vocational rehab to consider job retraining. *Id.* Dr. Klosterman continued: "I do feel that he is able to do some work but not something with major lifting to it. He may need to get retrained to do something work wise." *Id.*

Dr. Klosterman saw Plaintiff again on August 8, 2007, for another follow-up of his neck and shoulder pain. *Id.* Plaintiff indicated increased depression symptoms after his girlfriend left him. *Id.* Dr. Klosterman assessed Plaintiff as "moderately depressed appearing," but noted he denied suicidal symptoms. *Id.* Dr. Klosterman refilled Plaintiff's Lortab prescription and wrote a prescription for Prozac. *Id.*

Plaintiff saw Dr. Klosterman again on September 21, 2007 for a follow up on neck pain and anxiety. Tr. 304. Dr. Klosterman indicated that Plaintiff had started drinking again and did not get his prescription for Prozac filled because of the expense. *Id.* Dr. Klosterman noted that Paxil and pain medications were "okay but would really need him to be off of alcohol in the near future." *Id.* He switched Plaintiff from Prozac to Paxil and refilled the Lortab prescription. *Id.*

When Plaintiff returned to see Dr. Klosterman on November 16, 2007 for a recheck of an abscess under his right arm and regarding his neck pain, he told Dr. Klosterman he was seeking disability and stated he had "still been drinking some." Tr. 316. On examination, Dr. Klosterman noted Plaintiff smelled of alcohol and that he had a decreased range of motion in his right arm because of pain. *Id.* Dr. Klosterman noted he felt Plaintiff's "alcohol disease" was "of concern with his anxiety depression." *Id.* He refilled Plaintiff's Lortab. *Id.*

On January 14, 2008, Dr. Klosterman prescribed hydrocodone for Plaintiff's chronic neck pain and arthritis. Tr. 318.

Dr. Klosterman completed a questionnaire entitled "Questions to Scott Klosterman, D.O. Concerning the Medical Condition of [Plaintiff]" on February 5, 2008, Tr. 312-13, indicating that he had been Plaintiff's treating physician beginning in July 2006 and had last seen Plaintiff in November 2007. Tr. 312. Dr. Klosterman indicated he was treating Plaintiff for pain in his neck and right shoulder and for anxiety. *Id.* Expounding on the anxiety treatment, Dr. Klosterman indicated that Plaintiff's "pain and anxiety may contribute to drinking but alcohol use does not keep [Plaintiff] from working." *Id.* In describing the severity of Plaintiff's conditions, he indicated that the "combination of pain and anxiety would be the real reason for [Plaintiff's] not being able to work. Unfortunately, impairment of neck and shoulder are not likely to improve." *Id.* Dr. Klosterman opined that Plaintiff would be able to occasionally lift up to five-to-ten pounds and that his use of upper extremities would be his biggest limitation. *Id.* He indicated Plaintiff did not have an issue with sitting, but that he would have an issue with "sitting and reaching, leaning forward, working repetitively with arms and hands." *Id.* Dr. Klosterman further indicated Plaintiff's "major neck-shoulder impairment" would prevent him from doing the following: climbing stairs or ladders; pushing and pulling; and using his hands to operate machine controls. *Id.* Dr. Klosterman opined Plaintiff had moderately severe pain in his neck and shoulders, which he found was the result of an underlying condition that was documented in a February 2007 MRI and a July 2006 x-ray of the cervical spine. Tr. 313. Dr. Klosterman indicated that a July 2006 shoulder x-ray was normal, but noted that Plaintiff had a decreased range of motion and muscle spasms. *Id.* Dr. Klosterman opined Plaintiff's pain could "quickly increase to unacceptable levels with activity[,]" which would "likely interfere with normal work pace" and "create interruptions of work and the need for unpredictable periods of rest/breaks." *Id.* Further, Dr. Klosterman opined Plaintiff's pain, "in terms of an 8 hour work day," would

"interfere with sustained concentration and work pace." *Id.* In a space provided for additional comments or clarification. Dr. Klosterman noted that Plaintiff's anxiety was "pretty significant" and that he had "poor coping ability." *Id.* He also indicated Plaintiff's anxiety and pain "greatly reduced" his "concentration [and] ability to focus on a task," and opined Plaintiff was "likely to decompensate quickly when he encounter[ed]" difficulties. *Id.*

On March 12, 2008, Plaintiff returned to Dr. Klosterman with his chief complaint of continued neck and shoulder pain. Tr. 316. He reported he had been doing "pretty well" with the pain, but noted his anxiety had worsened. *Id.* On physical examination, Dr. Klosterman found Plaintiff was in no acute distress ("NAD"), was alert and oriented ("A&O"), and had some decreased range of motion and some spasm "posteriorly near the levator scapular." *Id.* Dr. Klosterman refilled Plaintiff's prescriptions for Paxil, Elavil, and Lortab. *Id.*

Plaintiff went to Upstate Carolina Medical Center's ER on May 18, 2008, for a testicular injury he incurred when stepping out of the shower at his home. Tr. 342-49. On examination, Plaintiff was found to be alert, oriented, and displayed normal behavior. Tr. 347. Notes indicated he could perform all ADLs without assistance. *Id.* Plaintiff was observed to have a normal affect, a normal, supple neck without tenderness, normal joint ranges of motion, and no motor or sensory deficits. Tr. 344. A scrotal ultrasound revealed evidence of a testicular injury. Tr. 349. Plaintiff denied neck pain, extremity pain, and joint pain. Tr. 343. He was diagnosed with penile and testicular contusion and orchitis (inflammation of a testis), treated with medication, and discharged in stable condition. Tr. 344, 348.

Dr. Klosterman followed up with Plaintiff on August 9, 2008, regarding his previous testicular injury and for his continued arthritis pain. Tr. 315. Dr. Klosterman found Plaintiff had a decreased range of motion in his neck and refilled his prescription for Lortab. *Id.*

Frank Barnhill, M.D., a consultative physician, examined Plaintiff when referred by South Carolina Vocational Rehabilitation.[2]  In his November 11, 2008 report, Tr. 367-68, Dr. Barnhill assessed "[p]ossible hypertension[; c]ervical degenerative disk disease with questionable bulging disk by history with left upper extremity greater than right upper extremity pain[; p]ost-traumatic right orchiectomy with history of testitcular abscess[; and [s]ituational depression, very mild." Tr. 368. Dr. Barnhill advised psychological testing, nerve-conduction studies of hands, a repeat MRI of the cervical spine, and indicated Plaintiff needed a physical therapy assessment for a work-hardening program. *Id.*

On February 11, 2009, Dr. Klosterman completed a "Questionnaire Concerning [Plaintiff]." Tr. 364. Dr. Klosterman indicated that Plaintiff could occasionally (defined as 1/3 of a workday) perform fingering and fine manipulation; he could perform gross manipulation for "a few minutes a day," and he could occasionally perform writing or typing activities. *Id.* Dr. Klosterman answered "[y]es" to the question of whether Plaintiff would have "frequent interruptions of work related task due to attention and concentration" if working eight-hours-per day for a five-day week. *Id.*  He based his opinion on Plaintiff's advanced cervical degenerative disc disease and anxiety disorder. *Id.* Dr. Klosterman said he based his opinion on MRI and x-ray for the physical diagnoses. *Id.*  He based his opinion regarding Plaintiff's limitations caused by

_____

[2]Dr. Barnhill's report was not before the ALJ, but was provided to the Appeals Council. *See* Tr. 1-5, Pl.'s Br. 10. The Appeals Council made it, as well as several records that post-dated the ALJ's decision, part of the administrative record. However, the Appeals Council found the additional evidence did not provide a basis for changing the ALJ's decision. Tr. 1-5. Both Plaintiff and the Commissioner include a description of Dr. Barnhill's report in their respective briefs; however, no argument is made that the additional evidence requires remand so that the ALJ as fact finder may consider it. *Cf. Meyer v. Astrue*, 662 F.3d 700, 705-06 (4th Cir. 2011) (holding when Appeals Council receives additional evidence but denies further review, court may review without remand to fact finder (ALJ) if it could still make substantial-evidence determination).

anxiety disorder on his "difficulty coping with stressors (job loss; traumatic motorcycle accident, surgery)." *Id.*

Several days later, on February 18, 2009, Dr. Klosterman provided the following typed statement regarding Plaintiff's impairments:

> [Plaintiff] has been seen as a patient at our office since March '05. Around 7/21/06, according to our office notes, [Plaintiff] began to suffer serious pain secondary to moderate to severe cervical disc disease in his neck as documented by MRI. Since approximately that time, [Plaintiff] has experienced chronic pain that I believe would significantly affect his ability to concentrate and focus on any kind of tasks, even simple tasks. I believe that he would undoubtedly experience frequent interruptions to his concentration throughout the workday due to his pain.

> Even if [Plaintiff] were to work at a job where he did not need to use his hands or lift (i.e. sedentary), I think that his chronic pain would interfere with his ability to concentrate and attend to any kind of work.

> Also due to his cervical disc disease, [Plaintiff] would not be able to use his arms and hands more than occasionally during the work day, and he would only be able to use his arms and hands for just brief periods of time, maybe 15-30 minutes at a time without needing to stop and rest from pain. I would not recommend that he lift any weight at all frequently. [Plaintiff] would need to rest away from the work station frequently throughout an 8 hour work day due to chronic pain. I would expect that his pain would be worse on some days and bad enough to keep him from attending work on a regular basis. He would probably miss more than 3 days of work per month due to his cervical pain.

> [Plaintiff] also suffers from an Anxiety Disorder that by itself would cause significant work related limitations of function. I believe that his anxiety problem alone, which preexisted his cervical problems, would cause him frequent interruption to even simple tasks. He frequently presents to me as agitated and nervous. I have observed that this agitation frequently interferes with his ability to attend to matters at hand.

Tr. 365.

    D.    Hearing Testimony

At his hearing on March 3, 2009, Plaintiff testified that he was divorced and lived with his mother and "tr[ied] to halfway take care of her," because she was disabled with COPD and breathing trouble. Tr. 47-48. He has grown children and is a high school graduate. Tr. 48. His

last job was running a fiberglass-weaving machine, and he left that job in March 2006. Tr. 50. He said the job required a lot of stretching and lifting and he first noticed problems at that time. *Id.* He said nothing in particular happened to cause him to quit then, and that his doctor explained that he had a degenerated disc, which happened over a period of time. *Id.* He said he had not sought employment since then, noting it hurt just to sit in the chair at the hearing. *Id.* Plaintiff explained that he was told that all discs in his neck were deteriorated and degenerated, which caused nerve damage, and that he had severe arthritis in his shoulders. Tr. 51. He said his left arm shook uncontrollably all of the time, and that he had very little strength in either arm. *Id.* Plaintiff said his doctor recommended surgery, but Plaintiff had not had surgery because he could not afford it. *Id.* He said he took hydrocodone for pain, which helped "a little bit." *Id.*

Plaintiff said he would have the surgery if he got insurance. Tr. 52. He said his severe arthritis had caused nerve damage in his shoulders, and explained that his left shoulder sometimes went "numb and tingly" and that he would drop things. *Id.* He said he took the same pain medication for his shoulder pain as for his neck pain. *Id.* Plaintiff also said he had anxiety and panic attacks that prevented him from being around people without getting "jerky all over and real nervous." *Id.* He said he started having the anxiety/panic issues around the fall of 2006. Tr. 52-53. Plaintiff said he saw Dr. Klosterman for his physical and mental problems, and that Dr. Klosterman had prescribed Paxil and amitriptyline for the anxiety and panic attacks. Tr. 53. He said he had mood swings and had days he did not want to do anything. *Id.* He said he did not receive therapy for the anxiety and panic attacks. *Id.*

When asked about his RFC, he said he could walk about 10 minutes before needing to sit down and could walk or stand about 10-15 minutes before needing to sit down because of pain in his lower back. Tr. 54. He said he could not sit for long periods of time and would have to "prop

up against something" because of pressure. *Id.* Accordingly, he said he usually lay down propped up or in a recliner. Tr. 55. Plaintiff indicated he thought he could sit for about 30 minutes without needing to stand. *Id.* Plaintiff said he could lift 10 pounds straight up, but that he had no strength to lift anything when extending his arms. *Id.* He said he could not reach overhead at all. *Id.*

Plaintiff said his grandchildren visited him several times per week and usually stayed an hour or two. Tr. 56. He said he attended church some, but not every Sunday. Tr. 58. He said he was not a member of any clubs or groups, and that he could no longer go to high school football games because of his panic attacks. *Id.*

He described a typical day as making coffee and something for breakfast and then sitting or lying around. *Id.* He said he read the paper some and watched TV. Tr. 59. He said he used to play softball and basketball, but could not play any longer. *Id.* He said he could dress and bathe himself. Tr. 59-60. He said he did not have a driver's license and had not driven since his license was suspended in 1994. Tr. 60. He said he could get his license again, but that he had not done so. *Id.* Plaintiff said he did very little cooking and almost no shopping. Tr. 60-61. He said he sometimes washed dishes and helped with laundry, but did no household cleaning. Tr. 61.

When asked about his alcohol use, he said he had problems with alcohol in the 1990s, but that alcohol was no longer a part of his life. Tr. 62-63.

The ALJ asked VE Benson Hecker, Ph.D. to consider a hypothetical individual of Plaintiff's age, education, and work experience with the RFC to lift up to 20 pounds occasionally, lift or carry up to ten pounds frequently, and stand or walk or sit for approximately six hours in an eight-hour day (light work as defined by the regulations), reduced by limitations from reaching overhead more than occasionally, handling more than frequently, and performing more than simple, routine tasks with more than occasional public contact. Tr. 68-69. VE Hecker

opined such an individual could not perform Plaintiff's past relevant work ("PRW") as he performed it or as it was customarily performed. *Id.* VE Hecker testified that jobs existed in the regional and national economies that such an individual could perform. Tr. 69. He cited packing, grading, and assembling jobs, and provided the incidence of these jobs in the regional and national economies, *id.*, as well as the DOT numbers, Tr. 71.

## II. Discussion

### A.    The ALJ's Findings

In his April 1, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant met the insured status requirements of the Social Security Act through September 30, 2006.

2.    The claimant has not engaged in substantial gainful activity since May 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disk disease and osteoarthritis of the neck, moderate to severe; osteoarthritis of the left shoulder; and anxiety (20 CFR 404.1521 *et seq.*, and 416.921 *et. seq.*).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  Specifically, he can lift and carry 20 pounds occasionally and 10 pounds frequently, sit 6 hours per 8 hour workday, and stand/walk 6 hours per 8 hour workday.  However, he can only reach overhead occasionally, handle frequently, and perform simple, routine tasks with only occasional public contact.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 7, 1960, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2006, through date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 15-25.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner

must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.

---

[3] "The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th

Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C. Analysis

Plaintiff alleges the ALJ erred by giving less-than-controlling weight to the opinions of Dr. Klosterman, Plaintiff's treating physician, improperly analyzing those opinions, and improperly substituting his own opinion for that of medical experts. *See* ECF Nos. 16, 24.

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). "Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). The ALJ has the

discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. Further, in undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence.

Plaintiff argues that Dr. Klosterman's opinions are "not inconsistent with" the weight of evidence and that the record does not contain "persuasive evidence" contrary to Dr. Klosterman's opinions. Accordingly, he submits the ALJ erred by not affording Dr. Klosterman's findings controlling weight. Plaintiff begins his argument by correctly pointing out that virtually all of the medical evidence before the ALJ was from Dr. Klosterman, Plaintiff's only treating, examining physician of record. Pl.'s Br. 15. Plaintiff points out that the other record evidence regarding his vocational abilities is from non-examining State agency consultants, two of whom completed evaluations of Plaintiff's claimed mental impairment, Tr. 270, 300, and one of whom evaluated Plaintiff's physical RFC, Tr. 281.

As set out in detail above, the record includes several opinions of Dr. Klosterman, *see* Tr. 253 (Sept. 12, 2006 questionnaire completed by Dr. Klosterman), 312-13 (Feb. 5, 2008); Tr. 364 (Feb. 11, 2009 questionnaire); Tr. 365 (Feb. 18, 2009 typed opinion), as well as numerous records of Dr. Klosterman's treatment of Plaintiff. In considering Plaintiff's claimed impairments, the ALJ summarized each of these opinions, as well as many of Dr. Klosterman's treatment notes. Tr. 17-20. Later in the decision, the ALJ evaluated opinion evidence, stating as follows:

> As for the opinion evidence, Dr. Klosterman's February 5, 2008 and February 18, 2009 opinions, which indicate that [Plaintiff] would be restricted from performing any competitive employment on a consistent and ongoing basis, are not supported by the record, including Dr. Klosterman's own treatment notes. Many of the limitations noted by Dr. Klosterman are related to [Plaintiff's] mental functioning. However, Dr. Klosterman's treatment records include very little information with

respect to [Plaintiff's] mental impairments and related functioning. Moreover, Dr. Klosterman is not a psychiatrist or a psychologist. In addition, [Plaintiff] never sought medical attention from a mental health professional. Furthermore, on May 25, 2007, Dr. Klosterman opined that the claimant would be "able to do some work but not something with major lifting to it. This is inconsistent with his subsequent opinions. Therefore, I am not giving controlling weight to Dr. Klosterman's opinions.

I am giving the Physical [RFC] Assessment completed by the State agency physician on February 7, 2007 some weight, but not significant weight. This is because, in giving the claimant limitations for medium work, the State agency physician did not take full account of [Plaintiff's] arm and neck limitations. See Exhibit 11F [Tr. 280-87].

Tr. 23.

Plaintiff submits the ALJ's analysis is lacking. The court agrees. A finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and § 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. In this case, the ALJ referenced Dr. Klosterman's opinions of February 5, 2008 and February 18, 2009 in considering the opinion evidence, and he did not give "controlling weight to Dr. Klosterman's opinions." Tr. 23. He did not reference Dr. Klosterman's other opinions, *see* Tr. 253 (Sept. 12, 2006), 364 (Feb. 11, 2009), in this analysis. Although the ALJ acknowledged the other opinions in that he recounted them in describing the medical evidence of record, Tr. 18-20, the undersigned cannot determine what weight, if any, he gave the other opinions, or why.[4]

---

[4]The court notes that, in discounting Dr. Klosterman's February 2008 and February 2009 opinions, the ALJ expressly pointed to one of Dr. Klosterman's treatment notes as being

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(1)-(6). Specifically, pursuant to 20 C.F.R. § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then consider the weight to be given to the physician's opinion by applying the following five factors: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(c)(2) through (5). Furthermore, Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188. SSR 96-2p provides in pertinent part as follows:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990). However, the court must not abdicate its duty to scrutinize the record as a whole to determine

---

inconsistent with his later opinions. Tr. 23 (quoting Tr. 305, May 25, 2007 treatment note in which Dr. Klosterman "opined [Plaintiff] would be 'able to do some work but not something with heavy lifting in it.'"). Although this analysis was appropriate, it is not sufficient for the court to perform its review.

whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

The Commissioner argues the ALJ appropriately considered and weighed Dr. Klosterman's opinions, submitting that the ALJ's findings were "supported by [] favorable objective findings" in Dr. Klosterman's records. Def.'s Br. 11. Further, he argues that the RFC the ALJ found Plaintiff had was "not inconsistent with" certain portions of Dr. Klosterman's opinions. *Id.* (citing Dr. Klosterman's findings at Tr. 305, 364-65 that Plaintiff could perform work with "limited lifting, fingering, fine and gross manipulation, and use of the arms/hands").

As an initial matter, the court notes that the regulatory-review scheme does not indicate the court should analyze whether the Commissioner's/an ALJ's findings are or are not inconsistent with specific portions of a treating source's opinion. Rather, the ALJ is to give controlling weight to a treating source's opinion unless it is not well-supported by diagnostic techniques and is "not inconsistent with the other substantial evidence" of record. 20 C.F.R. § 404.1527(c)(2). In turn, the court is to determine whether the ALJ has followed that guidance and whether the ALJ's opinion is supported by substantial evidence.

Further, much of the Commissioner's argument bolstering the ALJ's decision is derived not from the ALJ's decision itself, but from the Commissioner's combing of the record to find support for the ALJ's decision. *See* Def.'s Br. 10-17. The ALJ, not the Commissioner, must explain why a treating physician's opinion is discounted or rejected. The type of post-hoc rationalization offered by the Commissioner does not remedy the deficient analysis by the ALJ. *Steel v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the

ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

Here, although the ALJ referenced many of Dr. Klosterman's records in setting out Plaintiff's medical history and determining his severe impairments, Tr. 18-20, he provides very little to explain why he is "not giving controlling weight to Dr. Klosterman's opinions[,]" Tr. 23. His brief statement that Dr. Klosterman's February 5, 2008 and February 18, 2009 opinions "are not supported by the record, including Dr. Klosterman's own treatment notes[,]" *id.*, is insufficient.

Without more analysis from the ALJ, the court cannot determine whether his decision is in accord with applicable regulations or whether his decision is supported by substantial evidence. The undersigned recommends this matter be remanded for the ALJ to reconsider Dr. Klosterman's opinions in accordance with 20 C.F.R. §§ 404.1527(c)(1) and (2) (i-ii) and (3)-(5) and SSR 96–2. The requirement that an ALJ must give specific reasons for discounting a treating physician's testimony is well-established. The Agency has ruled that "the notice of the determination or decision . . . must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p.

Plaintiff also ascribes error because the ALJ did not expressly discuss the factors listed in 20 C.F.R. § 404.1527. As noted above, on remand, the ALJ is to analyze Dr. Klosterman's opinions in view of those factors.

Plaintiff further alleges the ALJ improperly discounted Dr. Klosterman's opinions regarding Plaintiff's anxiety and resulting limitations by finding Dr. Klosterman's "treatment records include very little information" regarding Plaintiff's "mental impairment and related

functioning[,]" and noting the physician is "not a psychiatrist or psychologist." Tr. 23. Plaintiff argues the ALJ impermissibly substituted his own judgment for that of a mental health professional. Pl.'s Br. 18-20. He also claims the ALJ violated SSR 96-8p by citing Plaintiff's failure to seek medical treatment from a mental health professional as a reason to discount Dr. Klosterman's findings regarding anxiety and its limitations without further consideration of why he did not seek such treatment. Pl.'s Br. 20-21. The court does not analyze these points fully herein because they all relate to the ALJ's proper analysis of the opinions of Dr. Klosterman and other record evidence as discussed above. On remand, the ALJ should consider these allegations of error, as well.[5]

III. Conclusion and Recommendation

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.

*Kaymani D. West*

July 26, 2012                                             Kaymani D. West
Florence, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

[5] *See Townsend v. Astrue*, C/A No. 9:10-1525-JFA, 2011 WL 4055402 (D.S.C. Sept. 12, 2011) citing *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 763-64 (W.D. Va. 2002) (noting that on remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted de novo ).